OFFICE OF THE ATTORNEY GENERAL · STATE OF TEXAS
JOHN CORNYN

May 4, 1999

The Honorable Eddie Lucio, Jr.
Chair, Special Committee on Border Affairs
Texas State Senate
P.O. Box 12068
Austin, Texas 78711-2068

Opinion No. JC-0039

Re: Whether Texas may implement a Grant Application Revenue Vehicle program in the absence of a constitutional amendment (RQ-0048-JC)

Dear Senator Lucio:

You have asked this office to consider whether the State of Texas or an agency thereof could issue Grant Anticipation Revenue Vehicle bonds (so-called "GARVEE Bonds"), a relatively new method of highway financing, without the necessity of amending the Texas Constitution. While several constitutional provisions may be relevant to your question, you express particular concern about article VIII, section 7-b, which dedicates federal reimbursement payments for highway construction to highway construction. Materials which have been furnished to us indicate that it is the view of the Comptroller of Public Accounts that amendment of section 7-b is unnecessary. On the other hand, a memorandum prepared by bond counsel for the Texas Transportation Commission indicates that it is their view that such amendment is necessary. *See* Memorandum from McCall, Parkhurst & Horton, L.L.P., to Honorable David Laney, Chairman, Texas Transportation Commission (Mar. 29, 1999) (on file with Opinion Committee) [hereinafter McCall, Parkhurst & Horton Memorandum of Mar. 29, 1999].

As a preliminary matter, we caution that the role of the Office of the Attorney General in issuing advisory opinions concerning questions of law is distinct from our function with regard to the approval of municipal bonds. We are here concerned solely with the former function, and nothing in this opinion should be construed as assuring the approval of a particular bond issue, particularly as no such bond issue is now before this office.

We note first that, while the approval of bonds by this office will cure any statutory defects from which they may suffer, *see* TEX. REV. CIV. STAT. ANN. art. 717k-8, § 3.002(d) (Vernon Supp. 1999), constitutional defects are another matter, *see Miller v. State ex rel. Abney*, 155 S.W.2d 1012 (Tex. Civ. App.–Waco 1941, writ ref'd). Further, we note that, in order to opine without qualification that a bond issue was legally valid, bond counsel would be required to conclude "that it would be unreasonable for a court to hold to the contrary." NATIONAL ASSOCIATION OF BOND LAWYERS, MODEL BOND OPINION REPORT, at 7 (1997 ed.). Given the high standard involved here, and given the risk involved of the potential invalidation of what might in light of the Comptroller's

suggestion be hundreds of millions of dollars worth of bonds, we believe that, while there may well be merit to the Comptroller's argument that a constitutional amendment is unnecessary, we cannot say that no court could reasonably agree instead with bond counsel for the Transportation Commission. That being the case, it would in the view of this office be more prudent for the legislature to seek to amend the Texas Constitution than to authorize the issuance of GARVEE bonds purely by statute.

Grant Anticipation Revenue Vehicles are a relatively new phenomenon. Briefly put, until 1995, "states could use their Federal highway grants to repay only the principal component of debt service on most projects. This restrictive rule was out of sync with the cash requirements that stem from real-world bond issues, since the predominant component of debt service during the early years of debt retirement is interest expense." 3 FHWA's INNOVATIVE FINANCE QUARTERLY, No. 2, at 1(Miriam A. Roskin & Max Inman eds., Fall 1997) <http://www.fhwa.dot.gov/innovativefinance/ifq32.htm>.

However, in 1995, 23 U.S.C. § 122 was amended to provide in relevant part:

> (b)    [T]he Secretary [of Transportation] may reimburse a State for expenses and costs incurred by the State or a political subdivision of the State and reimburse a public authority for expenses and costs incurred by the public authority for–
>
> > (1)    interest payments under an eligible debt financing instrument;
> >
> > (2)    the retirement of principal of an eligible debt financing instrument;
> >
> > (3)    the cost of the issuance of an eligible debt financing instrument;
> >
> > (4)    the cost of insurance for an eligible debt financing instrument; and
> >
> > (5)    any other cost incidental to the sale of an eligible debt financing instrument (as determined by the Secretary).

23 U.S.C. § 122(b) (Supp. 1995).

Section 122 allowed for the creation of the GARVEE bond idea. As the acronym suggests, these instruments are revenue bonds which look to future federal highway reimbursements as the source of the revenue.

Municipal bonds are divided broadly into two kinds – general obligation and revenue bonds. (There are also certain hybrid obligations with which we do not need to concern ourselves here.) General obligation bonds are typically instruments backed by the full faith and credit of the issuing state government. PUBLIC SECURITIES ASSOCIATION, FUNDAMENTALS OF MUNICIPAL BONDS, at 16, 193 (4th ed. 1990). Revenue bonds, on the other hand, are not and are payable only from a defined source. DAVID A. FRANKLIN & JAMES J. PRENDERGAST, GLOSSARY OF PUBLIC FINANCE TERMINOLOGY, at 36 (4th ed. 1992). In this particular case, the income on which the bond holders would be depending is the anticipated federal grants.

(One of the questions that has arisen, because the bonds are for a period longer than the current guarantee of federal financing, concerns the risk that in later years the federal government may decide it no longer wishes to continue financing highway construction. This risk appears negligible. However, negligible or not, it is a risk that for the purpose of Texas law must be borne by the bondholder. Any guarantee offered by the state to provide funds the federal government declines to provide would impermissibly create debt in violation of article III, section 49 of the Texas Constitution.)

At this point, some history is in order so as to make the constitutional questions intelligible. Texas highway construction has historically been financed by the state on a pay-as-you-go basis. *See* COMPTROLLER OF PUBLIC ACCOUNTS, CHALLENGING THE STATUS QUO – A REPORT FROM THE TEXAS PERFORMANCE REVIEW, at 220 (1999) [hereinafter CHALLENGING THE STATUS QUO]. Funding for this construction comes from motor vehicle license and registration fees and motor fuel taxes dedicated by article VIII, section 7-a of the Texas Constitution "for the sole purpose of acquiring rights-of-way, constructing, maintaining, and policing such public roadways, and for the administration of . . . laws . . . pertaining to the supervision of traffic and safety on such roads," and some federal funding. TEX. CONST. art. 8, § 7-a. In 1988, the voters adopted a constitutional amendment adding article VIII, section 7-b, which reads, "All revenues received from the federal government as reimbursement for state expenditure of funds that are themselves dedicated for acquiring rights-of-way and constructing, maintaining, and policing public roadways are also constitutionally dedicated and shall be used only for those purposes." *Id.* § 7-b

GARVEE bond financing would allow the issuance of bonds for eligible highway construction projects under title 23 of the United States Code. According to the Comptroller, "The GARVEE bond concept can be applied in one of two ways. In the first, a state issues the bonds for project construction and uses its future federal assistance to pay the debt service on the bonds. In [the second], states may use GARVEE bond revenue to pay for expenditures on pay-as-you-go projects and use their federal funds to pay debt service on other, debt-financed projects." CHALLENGING THE STATUS QUO, *supra*, at 221. The rationale for the second, or indirect, sort of GARVEE financing is as follows: Federal funds are received as reimbursement of state expenditures on highways; the concern of the federal government, therefore, is that the state has spent the money, not what revenue source the state's expenditure came from.

The constitutional questions which have been raised with regard to GARVEE bonds relate essentially to four provisions thereof: article III, sections 44, 49, and 50, and article VIII, section 7-b. As an examination of the various arguments which have been presented to us makes clear, the most serious issue is presented by article VIII, section 7-b. However, it may be helpful first to review briefly the article III provisions and the questions they raise.

Article III, section 44, in relevant part, forbids the legislature to "grant, by appropriation or otherwise, any amount of money out of the Treasury of the State, to any individual, on a claim, real or pretended, when the same shall not have been provided for by pre-existing law." TEX. CONST. art. III, § 44.

Article III, section 49 forbids the creation of debt by or on behalf of the State, except :

(1)    to supply casual deficiencies of revenue, not to exceed in the aggregate at any one time two hundred thousand dollars;

(2)    to repel invasion, suppress insurrection, or defend the State in war;

(3)    as otherwise authorized by this constitution; or

(4)    as authorized by Subsections (b) through (g) of this section.

*Id.* § 49(a). (Subsections (b) through (f) outline the procedure for statewide bond proposition elections.)

Article III, section 50 forbids the legislature "to give or to lend, or to authorize the giving or lending, of the credit of the State in aid of, or to any person, association, or corporation." *Id.* § 50.

On a number of occasions in the past, Attorneys General of Texas have asserted that a particular bond issue violated one or more of these constitutional provisions, and have therefore refused to approve the bonds. *See Texas Nat'l Guard Armory Bd. v. McCraw*, 126 S.W.2d 627 (Tex. 1939) (orig. proceeding); *Texas Turnpike Auth. v. Shepperd*, 279 S.W.2d 302 (Tex. 1955) (orig. proceeding); *Texas Public Bldg. Auth. v. Mattox*, 686 S.W.2d 924 (Tex. 1985) (orig. proceeding). In all these cases, because the bonds at issue were revenue bonds, and for the most part lease revenue bonds (that is, revenue bonds payable solely from the lease of certain properties), the Texas Supreme Court held that their issuance did not violate the relevant constitutional provisions. The fact that generally the bonds themselves recited that they were not general obligations of the State of Texas, but that the bondholder could look only to a certain defined revenue, though not conclusive, was persuasive evidence to the court that their issuance did not create a debt.

Lease revenue bonds, so long as they are in fact revenue bonds, do not constitute debt. However, article III, section 44 prohibits the payment of "revenue" bonds by direct legislative

appropriation. In Attorney General Opinion JM-970, this office considered whether the Texas Public Finance Authority could issue bonds denominated as revenue bonds, the principal and interest on which was, however, payable from direct legislative appropriation. Opinion JM-970 held that such an appropriation would violate article III, section 44 because, the bonds being revenue bonds, "not only would an appropriation for the purpose of paying principal and interest on [them] be unauthorized by pre-existing law, it would be an appropriation to pay for something that the legislature had expressly proclaimed itself unobligated to pay." Tex. Att'y Gen. Op. No. JM-970 (1988) at 7.

Generally speaking, pursuant to section 404.094 of the Government Code, all grants to the state, such as the federal funds involved here, are deposited in the treasury. *See* TEX. GOV'T CODE ANN. § 404.094 (Vernon 1998). Moneys in the treasury may, under article VIII, section 6 of the Texas Constitution, be removed only by legislative appropriation. *See* TEX. CONST. art. VIII, § 6. Accordingly, an article III, section 44 problem might arise if the grants were directly deposited in the treasury. However, the section 404.094 requirement is merely statutory; therefore, the section 44 problem could, we believe, be obviated by the statutory creation of a separate fund outside the treasury to hold these moneys if not otherwise restricted. The precise manner in which such a statutory scheme might be constructed is, of course, beyond the scope of this opinion. However, if such a fund is created and if it is clear that the proposed bonds are indeed revenue bonds which are not backed by Texas' full faith and credit and do not create constitutional debt, we believe that the potential article III, section 44 problems that have been suggested by the Transportation Commission's bond counsel can be resolved.

The more difficult issue is the argument that the use of the federal reimbursements here to pay debt service on the bonds would violate the requirements of article VIII, section 7-b.

At the time section 7-b was added to the constitution in 1988, the kind of financing instruments under discussion here did not exist. When section 7-b came into being, its reference to federal reimbursements for dedicated funds meant, essentially, all federal reimbursements, because the money spent to build highways was generally section 7-a money.

It is clear from the legislative history that the intent of section 7-b was that federal highway funds would stay dedicated to highways. The Legislative Budget Board's fiscal note, dated July 15, 1987, asserts, "The fiscal implication to the State would be to restrict the use of certain federal funds to specific purposes thereby limiting the future choices of the Legislature." FISCAL NOTE, Tex. S.J. Res. 8, 70th Leg., 2d C.S. (1987). The bill analysis of the House Committee on Ways and Means describes the purpose of the amendment as "[t]o constitutionally dedicate federal highway reimbursements for highway purposes." HOUSE COMM. ON WAYS & MEANS, BILL ANALYSIS, Tex. S.J. Res. 8, 70th Leg., 2d C.S. (1987). In explaining the background for the amendment in its Analyses of Proposed Constitutional Amendments, the Legislative Council wrote, "Under the federal program of aid for public highways, states are required to pay almost all costs of planning, land acquisition, and construction on a highway project. If a project meets federal aid specifications, the state is then reimbursed from federal money for a major portion of its expenses (generally 90 percent

of all costs of an interstate highway.) *The reimbursements have traditionally then been used in Texas to replenish the dedicated pool of state money.*" TEXAS LEGISLATIVE COUNCIL, INFORMATION REPORT NO. 88-1, at 15 (July, 1988) (emphasis added). Among the arguments for the amendment listed by the Legislative Council is, "If federal reimbursements of state highway expenditures are not required to be dedicated to highway and highway policing purposes, the dedicated pool of state money could easily be spent each year, and the availability of unrestricted money would be unforeseen from one fiscal biennium to another." *Id.* at 16. Based on all that, it is clear that the intent of section 7-b was to assure that federal highway reimbursements were to be spent on highways, and on nothing else.

With this in mind, the Transportation Commission's bond counsel assert that, "The use [of] federal reimbursements to pay debt service arguably avoids the will of the people as expressed in Sections 7-a and 7-b." McCall, Parkhurst & Horton Memorandum of Mar. 29, 1999, *supra*, at 6.

The Comptroller has responded to that argument by asserting that the reimbursements are not, in fact, reimbursements of dedicated funds. If what is being paid back is reimbursement for the expenditure of bond proceeds, then one escapes the section 7-b issue because the language of the section dedicates reimbursements for expenditure of "funds that are themselves dedicated." TEX. CONST. art. 8, § 7-b; *see* GARVEE Discussion from the Office of the Comptroller of Public Accounts, to the Opinion Committee, Office of the Attorney General (Mar. 1999) (on file with Opinion Committee).

The Comptroller's argument seems, on the face of it, a more than plausible one. If the reimbursements pay back the bond proceeds, they are not subject to the 7-b constraints, and arguably ought not to be because the reimbursements are not replenishing the 7-a pool, which – to the extent the projects are funded by the bonds instead – is not being drained.

However, bond counsel's argument is also an attractive and plausible one, particularly in light of the history of the constitutional provision. Morever, the Comptroller's argument may prove too much. If funds may be paid for debt service because they are not dedicated, the reason is that they are not dedicated, and therefore may be expended for any proper purpose.

As is apparent from our discussion, the Comptroller's and the bond counsel's arguments are plausible interpretations of the constitutional question, which would be a question of first impression if considered by a court. Even were we to conclude that the Comptroller has the better argument, our conclusion cannot guarantee judicial approval should the bonds be challenged in court. Unlike a statutory defect which may be cured by the Attorney General's approval of bonds, assuming such approval would be forthcoming, a constitutional defect cannot be so cured. Under the circumstances, we are compelled to advise you that the more prudent course of action for issuing GARVEE bonds is to secure an amendment of the Texas Constitution specifically permitting federal reimbursements to be used for paying debt service on GARVEE bonds. Issuing such bonds only upon statutory authorization risks the potential invalidation of hundreds of millions of dollars worth of bonds.

## S U M M A R Y

The amendment of the Texas Constitution specifically to permit federal highway reimbursements to be used for paying debt service on Grant Anticipation Revenue Vehicle ("GARVEE") bonds would be more prudent than the issuance of such bonds with merely statutory authorization.

Yours very truly,

JOHN CORNYN
Attorney General of Texas

ANDY TAYLOR
First Assistant Attorney General

CLARK KENT ERVIN
Deputy Attorney General - General Counsel

ELIZABETH ROBINSON
Chair, Opinion Committee

Prepared by James E. Tourtelott
Assistant Attorney General